## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOSEPH NORAH** | **CIVIL ACTION** |
| **VERSUS** | **NO. 15-1648** |
| **JAMES LEBLANC, NATHAN CAIN** | **SECTION "E"(4)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

I.    **Factual Background**

The petitioner, Joseph Norah ("Norah"), is a convicted inmate currently incarcerated in the Avoyelles Correctional Center in Cottonport, Louisiana.[2] On June 18, 2010, Norah and a co-defendant, Sean D. Watts, were charged by Bill of Information in Orleans Parish with the attempted second degree murder of Dayshawn Brown.[3]

The record reflects that, at around 4:00 a.m. on April 19, 2010, Brown drove to Gene's Po-Boys, near the corner of St. Claude Avenue and Elysian Fields Avenue in New Orleans, to get

---

[1]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. No. 1.

[3]St. Rec. Vol. 1 of 5, Bill of Information, 6/18/10.

something to eat.[4]  As he pulled up on the opposite side of St. Claude Avenue, he noticed an argument occurring between two men, later identified as Norah and Watts, and three women.  In an effort to avoid the altercation, Brown parked and decided to wait in his car for a while before entering the po-boy shop.  He passed the time by speaking on the phone with his cousin.

At some point, Brown heard one of the men shout out that he thought Brown was calling the police.  At that time, the altercation stopped and the two men, Norah and Watts, got into their red Chevrolet Monte Carlo, and turned onto St. Claude Avenue heading in the same direction as Brown's parked car.  When Brown saw this, he drove off and eventually had to stop at a red traffic light at the intersection of Elysian Fields and North Claiborne Avenue.  Brown noticed that the red Monte Carlo had followed him.  As the red Monte Carlo drove up next to Brown's stopped vehicle, he heard multiple "pops."  Brown was shot once through his nose and twice in his head, where one bullet still remains, and immediately drove himself to University Hospital.

Norah and Watts were jointly tried before a jury on June 1 through 3, 2011, and were found guilty as charged.[5]  At a hearing held on June 27, 2011, the Trial Court denied Norah's motions for a new trial and for post-verdict judgment of acquittal.[6]  The Court thereafter sentenced Norah to serve twenty-five (25) years in prison without benefit of parole, probation, or suspension of sentence.[7]

---

[4]The facts are taken from the Louisiana Fourth Circuit's opinion on direct appeal.  *State v. Norah*, 131 So.2d 172, 180-81 (La. App. 4th Cir. 2013); St. Rec. Vol. 3 of 5, 4th Cir. Opinion, 2012-KA-1194, pp. 4-7, 12/11/13.

[5]St. Rec. Vol. 1 of 5, Trial Minutes, 6/1/11, 6/2/11, and 6/3/11; St. Rec. Vol. 3 of 5, Trial Transcript, 6/3/11.

[6]St. Rec. Vol. 1 of 5, Sentencing Minutes, 6/27/11; Motion for New Trial, 6/27/11; Motion for Post-Verdict Judgment of Acquittal, 6/27/11; St. Rec. Vol. 3 of 5, Sentencing Hearing Transcript, p. 2, 6/27/11.

[7]St. Rec. Vol. 1 of 5, Sentencing Minutes, 6/27/11; St. Rec. Vol. 3 of 5, Sentencing Transcript, p. 7, 6/27/11.

The Trial Court also conducted a hearing on October 20, 2011, on the State's multiple offender bill charging Norah as a fourth felony offender.[8]  On October 21, 2011, the Court adjudicated Norah to be a fourth offender and resentenced him to serve forty-nine (49) years and nine (9) months in prison at hard labor.[9]  The Court denied Norah's motion to reconsider the sentence.[10]

On direct appeal to the Louisiana Fourth Circuit Court of Appeal, Norah's appointed counsel asserted the following grounds for relief:[11] (1) the Trial Court erred by denying the motion to suppress the identification; (2) the Trial Court erred by denying the motion to suppress the jailhouse tape recordings of telephone calls; (3) the Trial Court erred in allowing prejudicial and improper closing argument by the State; (4) the non-unanimous verdict denied Norah his right to a jury trial and due process; and (5) the Trial Court erred in imposing an unconstitutionally excessive sentence where the evidence showed Norah was not the shooter.  His counsel also later adopted the appellate brief filed on behalf of Watts in the joint appeal which included the following arguments:[12] (1) the Trial Court erred in denying the motion to suppress the identification; (2) the Trial Court erred in denying the motion for new trial; (3) the Trial Court erred in denying the motion to exclude the tapes of the jailhouse telephone calls; (4) the Trial Court erred in failing to grant a mistrial based on

---

[8]St. Rec. Vol. 1 of 5, Multiple Bill Hearing Minutes, 10/20/11; Multiple Bill, 6/27/11; St. Rec. Vol. 3 of 5, Multiple Bill Hearing Transcript, 10/20/11.  At the same hearing, the Court amended Watts's original sentence to twenty-five years and then resentenced him as second felony offender to serve 25 years.

[9]St. Rec. Vol. 1 of 5, Minute Entry, 10/21/11; St. Rec. Vol. 3 of 5, Multiple Bill Hearing Transcript, p. 6, 10/21/11.

[10]St. Rec. Vol. 1 of 5, Trial Court Judgment, 11/14/11; Motion to Reconsider Sentence, 11/14/11; see also, Minute Entry, 10/21/11; see also, St. Rec. Vol. 3 of 5, Multiple Bill Hearing Transcript, 10/21/11.

[11]St. Rec. Vol. 3 of 5, Appeal Brief, 2012-KA-1194, 9/24/12.

[12]St. Rec. Vol. 3 of 5, Motion to Adopt, 3/25/13; 4th Cir. Order, 3/27/13; Appeal Brief (Watts), 1/14/13.

improper closing arguments; and (5) a complete review cannot be made because the recording equipment failed to properly work during the testimony of the arresting officer.  On December 11, 2013, the Louisiana Fourth Circuit affirmed Norah's conviction and sentence finding no merit in the claims raised.[13]

Norah submitted a writ application on his own behalf to the Louisiana Supreme Court on January 8, 2014, asserting three grounds for review:[14] (1) the Trial Court erred in denying the motion to suppress the identification; (2) the Trial Court erred in admitting the 9-1-1 tape recordings and testimony about a shooting at the Duck Off that occurred prior to this incident; and (3) the Trial Court erred in allowing evidence of the jailhouse telephone calls made by Watts.  The Court denied the writ application without stated reasons on June 20, 2014.[15]

Norah's conviction and sentence became final ninety (90) days later, on September 18, 2014, because he did not file a writ application with the United States Supreme Court.  *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (conveying that the period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. S. Ct. Rule 13(1).

## II.   Federal Habeas Petition

On May 13, 2015, the clerk of this Court filed Norah's petition for federal habeas corpus relief in which he asserts under a broad reading two grounds for relief: (1) the identification

---

[13]*Norah*, 131 So.2d at 172; St. Rec. Vol. 3 of 5, 4th Cir. Opinion, 2012-KA-1194, 12/11/13.  The court also affirmed Watts's conviction for the same reasons.

[14]St. Rec. Vol. 3 of 5, La. S. Ct. Writ Application, 14-KO-0082, 1/13/14 (dated 1/8/14); La. S. Ct. Letter, 2014-KO-82, 1/13/14.

[15]*State v. Norah*, 141 So.3d 287 (La. 2014); St. Rec. Vol. 3 of 5, La. S. Ct. Order, 2014-KO-0082, 6/20/14.

evidence should have been suppressed as suggestive; and (2) evidence of the 9-1-1 and jailhouse telephone calls was admitted in violation of the Confrontation Clause.

The State filed a response in opposition to the petition conceding that the petition was timely filed and state court review of the claims was exhausted.  The State argues that Norah's claims are without merit and do not entitle him to federal habeas relief.

## III.   General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[16] applies to this petition, which is deemed filed in this Court by petitioner under the federal mailbox rule on May 8, 2015.[17]  The threshold questions on habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and the claims must not be in "procedural default."  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

In this case, the State concedes and the record reflects that Norah's federal petition was timely filed, state court review has been exhausted, and no procedural bar was imposed to prevent review of his claims.  The Court will proceed to address the substance of Norah's claims.

---

[16]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[17]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). The Clerk of Court filed Norah's petition on May 13, 2015, when it was received.  Norah dated his signature on the petition on May 8, 2015.  This is the earliest date appearing in the record on which he could have presented his pleadings to prison officials for mailing to a  Court.

IV.     **Standards of Review on the Merits**

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000).  It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the Court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA.  The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.  The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, __ U.S. __, 134 S. Ct. 1697, 1706-07 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not

'clearly established at the time of the state-court decision.'"  *White*, 134 S. Ct. at 1706 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485.  A state court's decision can involve an "unreasonable application" of federal law if it correctly identifies the governing rule but then applies it unreasonably to the facts.  *White*, 134 S. Ct. at 1706-07; *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law.  *See Williams*, 529 U.S. at 410.  The Court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law.  *Id*.  "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'"  *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."  *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).  The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.  *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).

In addition, review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits.  *Cullen v. Pinholster*, 563 U.S. 170, __, 131 S. Ct. 1388, 1398 (2011).

## V.    Identification Procedure

Under a broad reading, Norah alleges that the identification procedure used to allow the victim to identify him as one of the perpetrators was unduly suggestive and contrary to Supreme Court law.  Norah alleges that Brown did not provide an accurate or distinctive description of the shooter or the men arguing at the restaurant and the line-up was suggestive and encouraged by comments from the attending officer.  The State argues that Norah's claims are without merit, and the denial of relief was contrary to, or an unreasonable application of, Supreme Court law.

Norah's counsel pursued a motion to suppress the identification which was heard with other motions by the state trial court on October 29, 2010.[18]  After hearing the testimony of the detective who was with Brown during the identification and the argument of counsel, the state trial court denied the motion to suppress the identification and other motions not relevant to this discussion.

Norah's counsel raised the issue again on direct appeal challenging the denial of the motion to suppress the identifications.  In the last reasoned opinion by a state court, the Louisiana Fourth Circuit relied upon the factors outlined in *Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Perry v. New Hampshire*, __ U.S. __, 132 S. Ct. 716 (2012), and related state case law, to hold that the show-up procedure used in this case was suggestive; however, the procedure did not create a substantial likelihood of a misidentification by Brown.[19]

---

[18]St. Rec. Vol. 1 of 5, Minute Entry, 10/29/10; Hearing Transcript, 10/29/10.

[19]*Norah*, 131 So.2d at 172; St. Rec. Vol. 3 of 5, 4th Cir. Opinion, 2012-KA-1194, 12/11/13.

Evaluation of a claim of a suggestive identification process is a mixed question of law and fact. *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997); *see Coleman v. Quarterman*, 456 F.3d 537, 544 (5th Cir. 2006); *Woodard v. Thaler*, 414 F. App'x 675, 678 (5th Cir. 2011).   To be entitled to relief, petitioner must establish that the state courts' denial of relief was contrary to, or an unreasonable application of, Supreme Court law.

In *Perry*, cited by the Louisiana Fourth Circuit, the United States Supreme Court reiterated that the Due Process Clause of the Fifth Amendment guarantees a defendant's right to exclude as unreliable identification testimony that results from improper employment police procedures. *See Perry*, 132 S. Ct. at 725-26; *Simmons v. United States*, 390 U.S. 377, 383-84 (1968).  Consideration of an eyewitness identification is a two-part test requiring a court to consider (1) whether there was improper police conduct, and if so, (2) whether the improper conduct created the substantial likelihood of misidentification. *Perry*, 132 S. Ct. at 724-25 (citing *Neil v. Biggers*, 409 U.S. 188, 201 (1972)).

Thus, a reviewing court must assess "on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification,'" and the "[r]eliability of the eyewitness identification is the linchpin of that evaluation." *Perry*, 132 S. Ct. at 724 (quoting *Neil*, 409 U.S. at 201 and *Manson*, 432 U.S. at 114).  The Supreme Court has emphasized that the test for the suppression of an eyewitness identification is implicated only when law enforcement officers use an identification procedure that is both suggestive and unnecessary under the first part of the test. *Perry*, 132 S. Ct. at 724.  However, even if this threshold requirement is satisfied, the exclusion of the identification is only mandated when the identification is found not reliable under the second part of the test. *Id.*

In *Manson*, 432 U.S. at 114-16, also cited by the Louisiana Fourth Circuit, the Supreme Court identified several factors enumerated in *Neil*, 409 U.S. at 199, which should be considered when reviewing the reliability of a witness's identification.  These include: (1) the opportunity of the witness to view the subject; (2) the witness's degree of attention; (3) the accuracy of the description; (4) the witness's level of certainty; (5) the elapsed time between the crime and the identification; and (6) the corrupting influence of the suggestive identification itself.  *Passman v. Blackburn*, 652 F.2d 559, 570-71 (5th Cir. 1981); *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir. 1990); *Woodard*, 414 F. App'x at 678.

In Norah's case, Detective Krister Vilen testified at the suppression hearing that Brown, the victim, told him that the passenger in the red Monte Carlo shot at him.  He described the shooter as a black male with dark skin wearing a white button down shirt and white jeans.  The driver of the car was a dark-skinned black male wearing a white button down shirt and blue jeans.  The clothing was identified based on his observations as the men got into the car near the restaurant across the street.  Detective Vilen acknowledged that Brown had been given a sedative to ease his pain, but stated that Brown was alert and responsive to his questions.

Because the description matched the two men, Norah and Watts, who were arrested after fleeing the other crime scene in a red Monte Carlo, the officers arranged for the show-up identification.  Detective Vilen and Officer Batewell brought Brown to a secluded area near the waiting room of the hospital where there were windows.  Norah and Watts were brought from the police station to the hospital by other officers.  Each suspect was brought to the ramp one at a time for Brown to physically view.  Brown identified the first man, Watts, as the shooter.  He also identified the second man, Norah, as the driver of the red Monte Carlo.  At the time of the viewing,

Norah was wearing a red shirt, blue jeans and no shoes and Watts was wearing blue jeans and no shirt. The officers later recovered two white button down shirts from the Monte Carlo and a white t-shirt and tennis shoes from the bedroom where Norah and Watts hid before their arrest.

Detective Vilen testified similarly at trial regarding the circumstances of the show-up procedure.[20] On cross-examination, the Detective also testified that prior to the identification, he informed Brown that the police had detained some people who had been in a red Monte Carlo and the police wanted Brown to look at the people.[21]

Brown, the victim, also testified that the officers mentioned to him that they caught some people in a red Monte Carlo who they wanted him to see.[22] Brown further stated that the lighting at the po-boy parking lot allowed him to see the faces of the two men and their hairstyles and clothing. He identified the clothing worn by each man at that time. He clearly saw the two black men as they entered the red Monte Carlo. He described to the officers and at trial that the men were dark complected and one had a "bald fade" hairstyle.[23]

Brown also testified that when he made the identification of the men at the hospital, he was not persuaded to identify the men based on the officer's statement that the men had been in a red Monte Carlo.[24] Instead, he recognized each of the men "by their face, by their haircut, by their skin

---

[20]St. Rec. Vol. 3 of 5, Trial Transcript, pp. 129-31, 6/2/11.

[21]*Id.*, p. 158.

[22]*Id.*, pp. 19-75.

[23]*Id.*, p. 31.

[24]*Id.*, pp. 34-35, 49-50, 69, 73-75.

color and by some of the clothes that they had on."[25]  Although their clothing and hair length had changed, Brown was also able to identify the two men in court and correctly distinguish the driver from the passenger.[26]

In this case, the state trial court held a hearing on the motion to suppress the identifications and that testimony was reestablished at trial before the jury.  Later, on direct appeal, the Louisiana Fourth Circuit summarily determined that the show-up procedure used by the officers was suggestive.  Nevertheless, the Court examined the transcripts under the appropriate *Manson* factors and related federal and state law and resolved that Brown's identification was reliable.  Considering at a minimum the *Manson* factors listed previously, the record supports the state courts' conclusion that there was no misidentification.

First, as for Brown's opportunity to view the men, he consistently stated that he was able to view the two men from his car in adequate lighting for several minutes as they stood in the parking lot of the po-boy shop.  He also saw the two men from a few feet away as they pulled up next to him in the red Monte Carlo just before the shots were fired.  Second, out of concern for himself, Brown took note of the men and their clothing and physical characteristics in a sufficient manner to determine that he did not know the men.  Third, Brown remained consistent and accurate in his description of the men's complexion, hair styles, and clothing.  The matching clothes items were located by police either in the apartment, the car or still on Norah and Watts when they were arrested.  Fourth, Brown did not hesitate to identify the two men individually and with specificity as to which was the driver and passenger/shooter.  Fifth, the identification was made within hours

[25]*Id.*, pp. 35, 52, 69.

[26]*Id.*, pp. 37, 75.

of the shooting.  Finally, Brown confirmed that he was not coerced or influenced by the officers to make the identifications and was aware that he did not have to make an identification if he did not recognize the men and he was confident in his recognition of the men based on their physical characteristics and clothing.

Considering the foregoing, Norah has not established that Brown's identification was unreliable even if the show-up process was suggestive.  He therefore has not shown that the state courts' denial of relief was contrary to, or an unreasonable application of, Supreme Court law, including *Perry*, *Manson* and their progeny.  He is not entitled to relief on this issue.

## VI.   **Confrontation Clause**

Under a broad reading, Norah alleges that the admission of the three 9-1-1 recordings from the Duck Off shooting, which occurred prior to the incident at issue, violated his rights under Confrontation Clause.  The 9-1-1 callers identified the clothing worn by the persons chasing the victim and the red Monte Carlo involved.  He complains that the recordings suggested that he was involved in another crime and were used to prove that he was the same person in the same red Monte Carlo.

In addition, Norah appears to argue that, because Watts was a co-defendant, the admission of the recordings of the telephone calls made by Watts from the prison which implicated Norah in the shooting violated his constitutional rights.  He claims also that the state appellate court erroneously addressed this issue under the standards for non-testimonial statements in *Crawford* rather than under the prohibitions against the admissibility of a co-defendant's inculpatory statements set forth in *Bruton v. United States*, 391 U.S. 123 (1968).

Prior to trial, Norah's counsel filed several motions including motions to exclude evidence of and testimony about the 9-1-1 calls identifying the red Monte Carlo, the men dressed similarly to Norah and Watts, and the earlier shooting and to exclude the recorded jailhouse telephone conversations by Watts.[27]  The state trial court denied Norah's motions finding that the recordings and evidence of the prior shooting, including the 9-1-1 calls, were relevant and admissible under Louisiana evidentiary rules regarding *res gestae* (or excited utterances) and as forming an integral part of the criminal act or transaction.  On review of Norah's writ application, the Louisiana Fourth Circuit found no error in the trial court's ruling.[28]  The Louisiana Supreme Court also denied Norah's related writ application without stated reasons.[29]

When the issues were raised again on direct appeal, the Louisiana Fourth Circuit held that the 9-1-1 calls were related to an ongoing emergency and were non-testimonial in nature.  For this reason, the recordings of the 9-1-1 calls did not violate the Confrontation Clause.  The Court also resolved that Watts's statements in the jailhouse telephone calls were also non-testimonial and were not subject to the restrictions in *Bruton*.[30]  The Louisiana Supreme Court denied Norah's subsequent writ application without stated reasons.[31]

A Confrontation Clause claim presents a mixed question of law and fact.  *Fratta v. Quarterman*, 536 F.3d 485, 499 (5th Cir. 2008); *Horn v. Quarterman*, 508 F.3d 306, 312 (5th Cir.

---

[27]St. Rec. Vol. 1 of 5, Motion to Exclude Audio Recordings, 1/18/11; Motion to Exclude Jail Telephone Calls, 1/18/11.

[28]St. Rec. Vol. 5 of 5, 4th Cir. Order, 2011-K-0548, 5/26/11; 4th Cir. Writ Application, 2011-K-0548, 4/26/11.

[29]*State v. Norah*, 63 So.3d 1003 (La. 2011); St. Rec. Vol. 5 of 5, La. S. Ct. Order, 2011-KK-1095, 5/31/11; La. S. Ct. Writ Application, 11-KK-1095, 5/31/11.

[30]*Norah*, 131 So.2d at 172; St. Rec. Vol. 3 of 5, 4th Cir. Opinion, 2012-KA-1194, 12/11/13

[31]*Norah*, 141 So.3d at 287; St. Rec. Vol. 3 of 5, La. S. Ct. Order, 2014-KO-0082, 6/20/14.

14

2007).  The Court must determine whether the denial of relief was contrary to, or an unreasonable application of, Supreme Court law.

The Louisiana Fourth Circuit, in its last reasoned opinion, followed and applied the correct legal precedent to resolve Norah's claims.  The Sixth Amendment's Confrontation Clause gives the accused "[i]n all criminal prosecutions, . . . the right . . . to be confronted with the witnesses against him."  In *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), the Supreme Court held that the Confrontation Clause prohibits admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had (sic) a prior opportunity for cross-examination."  *Id.*, at 53-54.

Applying *Crawford*, in this case, Norah has not established that he was denied his rights to confront witnesses against him.  The 9-1-1 calls were admitted into evidence at Norah's trial in an effort to establish a basis for the officers to have been looking for a red Monte Carlo with occupants fitting the descriptions of Norah and Watts.  The admission of an out-of-court statement does not violate the Confrontation Clause when it is offered to explain why an officer conducted an investigation in a certain way.  *United States v. Brown*, 560 F.3d 754, 764 (8th Cir. 2009).

Specifically in the context of 9-1-1 calls, the Supreme Court has declared that "[s]tatements are non-testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."  *Davis v. Washington*, 547 U.S. 813, 822 (2006);[32] *see also*, *Michigan v.*

---

[32]In *Davis*, the Supreme Court addressed whether the admission of a 911 call recording violated defendant's right to confrontation when the caller did not appear at trial.  *Davis* involved a call from a complainant reporting that she was being physically abused by her boyfriend and providing the name of her assailant.  After the assailant fled, the complainant provided more details to the 911 operator, and police arrived on the scene.  *Id.*, at 817-18.  At trial, the responding officers testified about the complainant's injuries, but they could not identify her assailant.  The complainant did not appear at trial.  Over Davis's objection based on the Confrontation Clause, the trial court admitted the 911 recording identifying Davis as the assailant.

*Bryant*, 562 U.S. 344 (2011). This rule is also followed in Louisiana. *See State v. Collins*, 65 So.3d 271, 282-83 (La. App. 4th Cir. 2011).

As resolved by the state courts, the 9-1-1 calls in Norah's case were clearly related to an ongoing emergency as they were made within seconds of the shooting at the Duck Off before and as the shooters were fleeing the scene, and the calls were non-testimonial where their purpose was to obtain police assistance by providing the location of the victim and the status of the scene of the shooting. *See Martin v. Warden Forcht Wade Corr. Ctr.*, 289 F. App'x 682, 683 (5th Cir. 2008) (quoting *Davis*, 547 U.S. at 822) (statements to the 911 operator by a non-testifying attempted manslaughter victim, including her identification of defendant, "were nontestimonial because the circumstances, viewed objectively, indicated that the primary purpose of the interrogation by the 911 operator was 'to enable police assistance to meet an ongoing emergency.'"). The state courts denial of relief on this point was not contrary to, or an unreasonable application of, Supreme Court law.

Norah also has not shown that the use of Watts's jailhouse calls violated his Confrontation Clause rights under *Bruton* or *Crawford*. In the context of a multi-defendant trial, the Supreme Court has held that "the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). In *Bruton*,

---

In resolving whether the 911 recording identifying Davis as the assailant was testimonial, the Supreme Court established the following guidelines. Statements made primarily to enable assistance to meet an "ongoing emergency" are non-testimonial. Statements made primarily to "prove past events potentially relevant to later criminal prosecution" are testimonial. *Id.*, at 822 (footnote omitted). Finding that the primary purpose of the victim's 911 call identifying her assailant "was to enable police assistance to meet an ongoing emergency," the Court found that portion of the call to be non-testimonial and therefore admissible.

The Supreme Court specifically limited the scope of its decision in *Davis* to the first portion of the 911 call, when the victim was seeking police assistance. The Court recognized that statements made for the purpose of attaining emergency assistance may "evolve into testimonial statements once that purpose has been achieved." *Davis*, 547 U.S. at 828 (quotation and citation omitted). In the context of the *Davis* facts, the Court explained that once the emergency had ended, *i.e.*, once the assailant had left the scene, the complainant's statements may well have been testimonial. The Court noted that the evolving nature of the 911 conversation had been recognized by the state supreme court. The state court concluded that "even if later parts of the call were testimonial, their admission was harmless beyond a reasonable doubt." *Id.*, at 829.

the Supreme Court expressly prohibited admission of a non-testifying co-defendant's inculpatory statement made to police and which clearly implicated the other defendant. *Bruton*, 391 U.S. at 124 n.1, 135-36. However, the Supreme Court later created a distinction between testimonial and non-testimonial statements in determining admissibility in *Crawford*, 541 U.S. at 53-54.

Since *Crawford*, the Fifth Circuit has recognized that many federal courts have applied *Bruton* only to prohibit a co-defendant's statement found to be <u>testimonial</u> in nature and not those found to be non-testimonial.

> Many circuit courts have held that *Bruton* applies only to statements by co-defendants that are testimonial under *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed.2d 177 (2004). As these courts have observed, the Supreme Court described "statements from one prisoner to another" as "clearly nontestimonial" for the purposes of the *Crawford* analysis in *Davis v. Washington*, 547 U.S. 813, 825, 126 S. Ct. 2266, 165 L. Ed.2d 224 (2006) (analyzing the facts of *Dutton v. Evans*, 400 U.S. 74, 87-89, 91 S. Ct. 210, 27 L. Ed.2d 213 (1970) (plurality opinion)). Based on this dicta, the Fourth Circuit held in *United States v. Dargan*, 738 F.3d 643, 650-51 (4th Cir. 2013), that the rule of *Bruton* was "simply irrelevant in the context of nontestimonial statements" made "to a cellmate in an informal setting." The Third Circuit likewise held in *United States v. Berrios*, 676 F.3d 118, 128 (3d Cir. 2012), that *Bruton* is no longer applicable to a non-testimonial "prison yard conversation" because "*Bruton* is no more than a by-product of the Confrontation Clause." The First, Second, Sixth, Eighth, Ninth, and Tenth Circuits have also limited *Bruton* to testimonial statements only.

(footnotes omitted) *United States v. Vasquez*, 766 F.3d 373, 378-79 (5th Cir. 2014).

In this case, the calls made by Watts were not made in a formal setting, were not made to prosecutors, prison officials or police, and clearly were not made with an understanding that the inculpatory statements could be considered a confession by or prejudicial to him or Norah. As resolved by the state courts, Watts's statements during the jailhouse telephone call were not testimonial under *Crawford*.

17

The Supreme Court has not reconciled *Crawford*'s restriction on testimonial statements with the older *Bruton* limitation on co-defendant statements.  Nevertheless, it is clear that the *Bruton* court addressed the prohibition on the admissibility of a pretrial, <u>formal</u> confession by a non-testifying co-defendant.  Under current terms, the *Bruton* Court specifically addressed what would now be labeled a "testimonial" confession made to police in a <u>formal</u> interrogation.  The Supreme Court at that time, however, had not created a distinction between testimonial and non-testimonial and did not specifically use either term.  That distinction was made thirty-six (36) years later in *Crawford* when the Court clearly allowed for the admissibility of non-testimonial statements because they do not implicate the same constitutional concerns as testimonial statements.

In recent years, the lower federal courts seem to disagree on the impact the *Crawford* holding had on the *Bruton* rule, leaving room for interpretation and application of that rule on both ends of the spectrum.  *See*, *Vasquez*, 766 F.3d at 378-79.  Nevertheless, on habeas corpus review, this Court is limited to consideration of clearly established Supreme Court law and whether a state court's denial of relief is contrary to or an unreasonable application of that law.  At this time, however, there is no clearly established Supreme Court law that limits *Crawford* to witness statements other than those made by non-testifying co-defendants nor that expands *Bruton* to include even non-testimonial statements by a non-testifying co-defendant.  As such, there is no clearly established Supreme Court rule of law prohibiting the admission of an informal, non-testimonial statement by a non-testifying co-defendant.  The lower federal courts interpretation or expansion of Supreme Court doctrine will not suffice.  *See White*, 134 S. Ct. at 1706-07.  Where there is no clearly established law, the state courts' denial of relief can not be contrary thereto.  *Id*.

Even if a reviewing court could find that a *Bruton* error occurred in this case, it is subject to harmless error analysis. *United States v. Lage*, 183 F.3d 374, 388 (5th Cir. 1999). The reviewing court must consider "not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). This is true especially when the erroneously admitted evidence is "merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury." *Brown v. United States*, 411 U.S. 223, 231 (1973).

The evidence, other than any statement by Watts, was ample to establish that Norah and Watts shot Brown and the sufficiency of that evidence is not challenged here. Based on the record before the Court, the State was able to prove each element of attempted second degree murder, even without the recorded jailhouse calls, where the evidence proved that Norah and Watts targeted Brown, chased him in the car, and Watts shot him multiple times in an effort to kill him. There was no constitutional error arising from the admission of the recorded jailhouse calls by Watts.

The state courts denial of relief was not contrary to, or an unreasonable application of Supreme Court law. He is not entitled to relief on this issue.

**VII.   Recommendation**

For the foregoing reasons, it is **RECOMMENDED** that Norah's petition for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[33]

New Orleans, Louisiana, this 8th day of January, 2016.

_____

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[33]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.